## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

James Bryant,              Case No. 1:23cv2032

        Plaintiff,

        -vs-

                  **JUDGE PAMELA A. BARKER**

City of Berea, et al.,

        Defendants.              **MEMORANDUM OPINION & ORDER**

Currently pending is the Motion for Summary Judgment of Defendants City of Berea, City of Berea Police Department, and City of Berea Police Officers Daniel Kelly, Adam Laeng, Stephanie Santos, Jeffrey Douglas, and Joseph Quinn.  (Doc. No. 31.)  Plaintiff James Bryant filed a Brief in Opposition on December 16, 2024, to which Defendants replied on December 30, 2024. (Doc. Nos. 34, 36.)  Also pending is Plaintiff's Motion for Leave to File Sur-Reply Instanter (Doc. No. 37.) Defendants filed a Brief in Opposition on January 8, 2025.  (Doc. No. 38.)  Plaintiff did not file a Reply.

For the following reasons, Plaintiff's Motion for Leave to File Sur-Reply Instanter (Doc. No. 37) is GRANTED IN PART and DENIED IN PART, as set forth herein. Defendants' Motion for Summary Judgment (Doc. No. 31) is GRANTED.

## I.  Facts

### A.  911 Call and Officer Douglas and Officer Santos's Initial Approach to the Bryant Residence

This matter arises out of an incident that occurred on October 19, 2022.  At approximately 10:28 a.m. on that date, the City of Berea Police Department received a 911 call from a woman

identifying herself as a friend of Cynthia (also referred to as Cindy) Bryant. [1] (Doc. No. 28 at PageID# 221; Audio of 911 call.) The caller (who asked to remain anonymous) stated that Ms. Bryant had sent her a text indicating that her husband, Plaintiff James Bryant, had just hit her and taken away her phone. (*Id*.) The caller stated that Ms. Bryant had been able to get a quick message to the caller before Plaintiff took her phone. (*Id*.) The caller indicated that Ms. Bryant stated that Plaintiff told her that "if she [i.e,. Ms. Bryant] wasn't dead by the end of the day, it would be a miracle." [2] (*Id*.) The caller told the dispatcher that Ms. Bryant's husband "has a real bad temper" and that there was a "history of violence." (*Id*.) The caller expressed concern for Ms. Bryant's safety and requested that the police conduct a welfare check. (*Id*.) The caller also indicated that she did not know if there were any weapons in the house. (*Id*.)

Defendant City of Berea Police Officers Stephanie Santos and Jeffrey Douglas were dispatched to the Bryant residence to conduct a welfare check for "potential domestic violence." (Santos Depo. (Doc. No. 29) at Tr. 10-11; Douglas Depo. (Doc. No. 28) at Tr. 9.) Both Officers testified that, prior to their arrival at the Bryant residence, they were advised by the dispatcher that a female had reported being struck and fearing that she was not going to be alive by the end of the day. [3] (Santos Depo. at Tr. 10-11; Douglas Depo. at Tr. 20-21.)

---

[1] Defendants manually filed a flash drive, under seal, containing audio from the 911 call to the City of Berea Police Department on October 19, 2022 regarding Ms. Bryant. *See* Doc. No. 33.

[2] It is not entirely clear whether *Ms. Bryant* said that "it would be a miracle" if she was still alive by the end of the day, or if Ms. Bryant told the caller that *Plaintiff* said "it would be a miracle" if Ms. Bryant was still alive by the end of the day. During the audio call, the caller first appears to say that Ms. Bryant made this statement, but then later indicates that Ms. Bryant said that Plaintiff made this statement. The Call for Service Report (Doc. No. 28 at PageID# 221) indicates that Plaintiff made this statement.

[3] During his deposition, Plaintiff adamantly denied that he hit Ms. Bryant on October 19, 2022. (Bryant Depo. (Doc. No. 27) at Tr. 57-58.)

Body cam footage[4] shows that Officers Santos and Douglas arrived at the Bryant residence at approximately 10:45 a.m.  Officer Santos stood in the driveway, while Officer Douglas approached the front door.  Officer Douglas testified (and the footage shows) that he heard raised voices inside. (Douglas Video I at 10:45:39 -:43;[5] Douglas Depo. at Tr. 9-11; Santos Video at 10:45:39-:43; Santos Depo. at Tr. 11.)  *See also* Incident/Offense Report (Doc. No. 28) at PageID# 224.  Officer Douglas knocked on the front door and rang the doorbell several times.  After several minutes, Plaintiff opened the door.  Officer Douglas advised Plaintiff that they had "gotten a call about an alarm going off" and wanted to make sure that everyone was okay.   (Douglas Video I at 10:47:40; Douglas Depo. at Tr. 12.)  During his deposition, Officer Douglas acknowledged that there was, in fact, no call about an alarm.  (Douglas Depo. at Tr. 12-13.)  He testified that he gave this reason to Plaintiff in order to "alleviate the anger I could sense coming from the inside and the seriousness of the call," explaining that "if I can downplay it and get the access that I needed to make sure everyone was okay, I would rather do that than confront someone who is already angry." (*Id.* at Tr. 13.)

Officer Douglas then asked Plaintiff if there was anyone else in the house.  (Douglas Video I at 10:47:47.)  Plaintiff indicated that his wife was there and stated that she was okay.  (*Id.* at 10:47:43-:45.)  Officer Douglas advised that he wanted to talk to Ms. Bryant, at which point Plaintiff became agitated.  (*Id.* at 10:47:47 to 10:48.)  Plaintiff stated that he had already indicated that his wife was okay, questioned why the officers needed to talk to her, and asked "what alarm?" (*Id.*)  Plaintiff then

---

[4] The Body Camera Footage from Officer Santos' and Officer Douglas' initial approach to the Bryants' residence was manually filed as "Exhibit 1" to Defendants' Motion for Summary Judgment and authenticated by City of Berea Chief of Police Dan Clark.  *See* Doc. No. 31-1.  The footage of Officer Santos's initial approach (hereinafter "Santos Video") is captured in the video file ending in "013037785_Video0.mp4."  The footage of Officer Douglas's initial approach (hereinafter "Douglas Video I") is captured in the video file ending in "0012112795_Video0.mp4".

[5] When citing to body cam footage in this case, the Court cites to the actual time stamp at the top right-hand corner of the footage.

closed the door.  (*Id*.)  *See also* Douglas Depo. at Tr. 13-14; Santos Depo. at Tr. 12-13; Bryant Depo. at Tr. 53-55.

At that point, Officers Douglas and Santos decided to "switch places" to see if Plaintiff would be willing to talk to Officer Santos instead.  (Santos Depo. at Tr. 13-14; Douglas Depo. at Tr. 14-15.) Officer Santos knocked on the front door and rang the doorbell.  Plaintiff answered the door and angrily accused the Officers of lying to him about an alarm going off.  (Santos Video at 10:49:28 - :32.)  Officer Santos explained that she needed to speak to Ms. Bryant to make sure she was okay. (*Id*.)  Plaintiff opened the front door wide and pointed to Ms. Bryant, who was standing inside the house about six steps up the front staircase.  (*Id*.)  Ms. Bryant can be heard saying "I'm fine," after which Plaintiff immediately shut the door. (*Id*. at 10:49:32 - :36.)

Officer Santos can be heard on the footage stating, "I don't know… I really wanted to talk to her."[6]  (*Id*. at 10:49:47- :49.)  She knocked on the door again, and Plaintiff can be heard yelling "get out of here."  (*Id*. at 10:49: 49 - :56.)  Plaintiff opened the door and began arguing with Officer Santos. (*Id*. at 10:50:03 - :12.)  Officer Santos explained that she needed to speak with Ms. Bryant privately in order to satisfy her legal requirement to ensure that Ms. Bryant was okay.  (*Id*. at 10:50:03 - :34.) Plaintiff opened the door, apparently to show Officer Santos that Ms. Bryant was standing on the second floor balcony.  (*Id*. at 10:50:20 - :26.)  Officer Santos again explained that she needed to speak with Ms. Bryant privately.  (*Id.* at 10:50:27 - :32.)   Plaintiff then said "get the f*** out of here" and shut the door.  (*Id.* at 10:50:32 -:34.)  *See also* Douglas Video I at 10:49 to 10:50:36.

---

[6] During her deposition, Officer Santos testified as follows: "At one point she was standing on the stairs and he [i.e., Plaintiff] was kind of blocking her on the bottom of the stairs, she was right here and then he was yelling, you know, about she's okay and she did say that I'm fine, I believe is what she said, in a shaky voice but the look on her face was that she was not okay and then the door was slammed and I didn't feel confident in that moment that she was actually fine."  (Santos Depo. at Tr. 14-15.)

Officer Santos can then be heard speaking with Officer Douglas.  She indicated that this is "obviously a domestic" and observed that "he's not even allowing her to speak."  (Santos Video at 10:50:40 - :44.)  Officer Santos summarized what the Officers knew at that point, i.e., that Ms. Bryant "is alleging from this individual that he took the phone and he supposedly hit her, and that she might be dead by the end of today."  (*Id.* at 10:51:00- :09.)  Officer Santos confirmed to Officer Douglas that she had seen Ms. Bryant but indicated that "she's so afraid of him that she's not even coming down the stairs."  (*Id.* at 10:51:09 - :24.)

During deposition, both Officer Santos and Officer Douglas testified that they did not personally witness any domestic violence while responding at the Bryant residence on October 19, 2022.  (Santos Depo. at Tr. 14; Douglas Depo. at Tr. 37.)  However, Officer Santos testified that she remained concerned for Ms. Bryant's safety.  (Santos Depo. at Tr. 14-15, 20.)  Officer Santos testified that she (i.e. Santos) "didn't feel confident in that moment that [Ms. Bryant] was actually fine.  That was not — it did not meet the legal requirement for me to leave.  I still had to speak with her further and away from Mr. Bryant to ensure her safety."  (*Id.* at Tr. 15.)  At approximately 10:52 a.m., Officer Santos called Sergeant Andy Laeng and advised him of the situation.[7]  (Douglas Video I at 10:51:54 to 10:52:20; Santos Depo. at Tr. 17-18.)

**B.      Sergeant Laeng, Officer Quinn, and Detective Kelly Make Further Attempts to Speak with Ms. Bryant**

---

[7] Officer Santos can be heard advising Sergeant Laeng, in relevant part, as follows: "There's a domestic issue going on in here. [inaudible] yelling at us and not really able to speak with the wife. He keeps slamming the door in our face. I did see that she is alive, however, we didn't get to talk to her about was she struck, does she fear for her life, and then obviously with the phone taken from her he's not letting her talk .. she was up on the stairs and then she was up on the balcony."  (Douglas Video I at 10:51:54- 10:52:20.)

At 11:03 a.m., Sergeant Andy Laeng and Officer Joseph Quinn arrived at the Bryant residence.[8]  Officers Santos and Douglas were also present but remained at a distance from the front door.  Sergeant Laeng's body cam footage shows that he approached the front door and rang the doorbell.  (Laeng Video I at 11:03:15-:30.)  Plaintiff opened the door and asked "why do you guys keep bothering me?"  (*Id.* at 11:03:34.)  Sergeant Laeng introduced himself and explained that somebody had called the police and expressed concern regarding Ms. Bryant's welfare.  (*Id.* at 11:03:35- 11:04:49.)  Sergeant Laeng stated that they needed to speak with Ms. Bryant privately to make sure that she was okay.  (*Id.*)  Plaintiff became agitated and repeatedly indicated that Officer Santos had already seen Ms. Bryant and that Ms. Bryant had told Officer Santos that she was okay.  (*Id.*)  He accused the police of harassing him.  (*Id.*)

Officer Quinn was present with Sergeant Laeng at Plaintiff's front door.  Officer Quinn's body cam footage shows that he also spoke to Plaintiff and explained that the protocol for a situation involving allegations of domestic violence was to separate the individuals and to speak to each of them separately.  (Quinn Video at 11:03:35 to 11:04:49.)  Officer Quinn stated that they did not mean to upset Plaintiff and that they just needed to talk to Ms. Bryant separately for "two seconds."  (*Id.*)  Plaintiff insisted that the Officers had already seen and spoken to Ms. Bryant and that she had indicated that she was okay.  (*Id.*)  Plaintiff refused to allow the Officers to speak with Ms. Bryant and shut the door.  (*Id.*)

---

[8]Sergeant Laeng and Officer Quinn's Body Camera footage was manually filed as "Exhibit 1" to Defendants' Motion for Summary Judgment and authenticated by Berea Police Chief Dan Clark.  *See* Doc. No. 31-1.  The footage of Sergeant Laeng's initial response to the Bryant residence  (hereinafter "Laeng Video I") is captured in the video file ending in "0129342071_Video0.mp4."  The footage of Officer Quinn's initial approach (hereinafter "Quinn Video I") is captured in the video file ending in "000936760_Video0.mp4".

Sergeant Laeng's body cam footage shows that he then walked over to the driveway and asked Officer Santos if she had seen Ms. Bryant.  Officer Santos explained that she saw Ms. Bryant standing on the stairs but Plaintiff would not let her come to the door, and that Ms. Bryant said "I'm fine" in a shaky voice.  (Laeng Video I at 11:05:34 to 11:05:50.)  Officer Santos reiterated that she was not confident that Ms. Bryant was okay, particularly since she and Officer Douglas had heard yelling inside the house when they first approached the residence.  (*Id.*)

Sergeant Laeng and Officer Quinn continued to ring the doorbell and knock on the front door for several minutes.  (Quinn Video I at 11:06 to 11:10.)  Video footage shows that Plaintiff did not open the door or otherwise respond to the officers.  (*Id.*)  During his deposition, Sergeant Laeng acknowledged that he did not observe any "domestic violence activity" during this encounter.  (Laeng Depo. (Doc. No. 30) at Tr. 9-10.)  However, Sergeant Laeng testified that he was not satisfied that Ms. Bryant was safe, explaining as follows: "[Plaintiff] would not let us see her, his wife, that we knew she was inside the house. … He would not allow us to speak with her in person, directly without him next to her at all." (*Id.* at Tr. 9.)

Sergeant Laeng and Officer Quinn can be heard on the body cam footage discussing what to do next.  (Laeng Video I at 11:09:51 – 11:10:05.)  Officer Quinn indicated that he did not want to have to make a "dynamic entry" but stated that "we don't know that she's okay" and "we need to check her welfare." (*Id.*)  He observed that Plaintiff "certainly isn't acting rational." (*Id.*)  Sergeant Laeng and Officer Quinn decided to call the station for further guidance.  (*Id.*)

During his deposition, Plaintiff acknowledged that he became "agitated" during this encounter.  (Bryant Depo. at Tr. 55-57, 60-61.)  He testified that he did not understand why the police needed to speak with Ms. Bryant in private because an "alarm went off," especially when she had

7

already stated to the police that she was okay.  (*Id.* at Tr. 55-57.)  When asked why he would not allow the police to speak privately with Ms. Bryant, Plaintiff stated "I didn't have to.  They didn't need to."  (*Id*. at Tr. 56.)

Defendant City of Berea Police Detective Daniel Kelly then called the Bryants' landline. According to his "Affidavit of Probable Cause,"[9] Detective Kelly spoke with Plaintiff and "informed him that [he] was trying to make sure everything inside the house was okay."  (Doc. No. 28 at PageID# 220.)  Detective Kelly indicated that Plaintiff was initially "agitated" during the call but that he calmed down and allowed Detective Kelly to speak with Ms. Bryant.  (*Id.*)  Ms. Bryant told Detective Kelly that she was okay.  (*Id.*)  *See also* Bryant Depo. at Tr. 61-62.  Detective Kelly asked Ms. Bryant if she was free to leave, and Ms. Bryant said that she "guessed so."  (Doc. No. 28 at PageID# 220; Bryant Depo. at Tr. 62.)

It appears that, at approximately 12:38 p.m., Detective Kelly called the Bryant residence again, "under the guise of inquiring about how things were going now that they were calmed down." (Doc. No. 28 at PageID# 229.)  According to Detective Kelly, Plaintiff stated that he was going to lay down and that Ms. Bryant was about to leave to go to the bank.  (*Id.*)  *See also* Laeng Depo. at Tr. 10.  Meanwhile, Sergeant Laeng stayed in his vehicle down the street from the Bryants' residence "to see if there was any activity [in] the house, if anyone was leaving."  (Laeng Depo. at Tr. 11.)

### C.      Traffic Stop of Ms. Bryant

---

[9]The record before the Court does not contain a deposition transcript of Detective Kelly.

Shortly thereafter, Ms. Bryant left the residence in her vehicle.  Sergeant Laeng followed her and initiated a traffic stop at approximately 12:58 p.m.[10]  (Laeng Video II at 12:58.)  Sergeant Laeng advised Ms. Bryant that he "just wanted to make sure everything's okay with you" and asked her "what's going on."  (*Id*. at 12:58:48 - :55.)  Ms. Bryant said that she was alright.  (*Id*.)  She explained that Plaintiff had called her a liar about some bills, taken her phone, and discovered that she had more money in her account than he expected.  (*Id*. at 12:59:10 - :17.)  When Sergeant Laeng indicated that there had been a report Plaintiff had "beat her up," Ms. Bryant said no but indicated that Plaintiff had "hit me in my head."  (*Id*. at 12:59:42 - :48.)  Ms. Bryant stated that she did not want the police to arrest Plaintiff because it would "just make things worse."  (*Id*. at 12:59:48 - 13:00.)

Sergeant Laeng explained that the police wanted to help her and that the only way they could do that was to arrest Plaintiff and put him in jail.  (*Id*. at 13:00:04 – 13:01:18.) Ms. Bryant acknowledged that Plaintiff had "slapped" her in the head but reported that she was not bruised or hurt and did not need medical attention.  (*Id*.)  Sergeant Laeng indicated that, based on what she was telling him, the police could arrest Plaintiff without having her sign charges.  (*Id*.)  Ms. Bryant responded that she had Detective Kelly's phone number and would call him "if it gets worse."  (*Id*.)

Sergeant Laeng expressed concern about Ms. Bryant waiting for it to get worse.  (*Id*. at 13:01:21 – 13:02:52.)  Ms. Bryant indicated that Plaintiff had not been violent "for awhile" and repeated that arresting him "would make things worse."  (*Id*.)  When asked if she wanted to leave her husband, Ms. Bryant responded that "if I could, I would."  (*Id*.)  Upon further questioning by Sergeant

---

[10] The traffic stop of Ms. Bryant's vehicle is captured by Sergeant Laeng's body cam footage, which was manually filed as "Exhibit 1" to Defendants' Motion for Summary Judgment and authenticated by Berea Chief of Police Dan Clark.  *See* Doc. No. 31-1.  The traffic stop footage (hereinafter "Laeng Video II") is captured in the video file ending in "0129355881_Video0.mp4."

Laeng, Ms. Bryant stated that Plaintiff was a "convicted felon" for receiving stolen property but that he did not have a history of violent crime[11] and did not own a gun. (*Id*.)

At that point, Detective Kelly called Sergeant Laeng. (*Id*. at 13:03:18 -13:04:35.) Sergeant Laeng stepped away from Ms. Bryant's vehicle and updated Detective Kelly regarding the situation. (*Id*.) Sergeant Laeng then returned to Ms. Bryant's vehicle and advised her that Detective Kelly had spoken with Ms. Bryant's son, Jeremy, and that Detective Kelly was concerned about her safety and was on his way to join them. (*Id*. at 13:04:46 - :50.) While they were waiting for Detective Kelly to arrive, Sergeant Laeng explained to Ms. Bryant that, if they arrested Plaintiff, the judge could issue a temporary protection order, which would require Plaintiff to move out of the house and stay away from her. (*Id*. at 13:04:50 to 13:09:30.) Ms. Bryant repeated that she did not want the police to arrest Plaintiff because "he's been really good until today" and arresting him "will make things worse." (*Id*.)

Detective Kelly arrived at the traffic stop at approximately 1:10 p.m. Ms. Bryant can be heard telling Detective Kelly that Plaintiff "has not done this for awhile" and she "does not want to do anything today." (*Id*. at 13:10:35-45.) Detective Kelly called Jeremy, who spoke with his mother for a few minutes on the phone. (*Id*. at 13:11:07 – 13:13:20.) After Ms. Bryant completed her call with Jeremy, Detective Kelly explained that Ohio's domestic violence laws are very strict and that, if domestic violence is reported to them, they "do have to take action." (*Id*. at 13:17:16 - :30.) Detective

---

[11] Later, however, Ms. Bryant stated that there had been a previous "domestic violence incident" involving Plaintiff. Ms. Bryant indicated that, as a result of that incident, her son Jeremy had taken her to the hospital, where she was treated for a broken finger. During his deposition, Plaintiff testified that, in 2003, he was arrested for domestic violence when he "slapped" Ms. Bryant and she complained that he had broken her arm. (Bryant Depo. at Tr. 13-15.) He testified that he pled no contest and was sent to anger management classes. (*Id*. at Tr. 15-16.) Defendants assert (and Bryant does not dispute) that "records from the criminal case that resulted from those injuries confirm that same happened in or around 2003." (Doc. No. 31 at PageID# 264.)

10

Kelly stated that "we are going to take action to charge [Plaintiff] with domestic violence and place him under arrest."  (*Id.*)

Ms. Bryant repeated that she did not have any bruises and expressed concern that Plaintiff would know that she reported him for domestic violence.  (*Id.* at 13:17:50 – 13:22:52.)  She again confirmed that Plaintiff had struck her in the back of her head but indicated that she did not want to go "this route."  (*Id.*)  Detective Kelly indicated that "this route is already started."  (*Id.*)  Detective Kelly then asked Ms. Bryant if she would be willing to provide a key to the residence.  (*Id.*)  Ms. Bryant expressed concern that Plaintiff would eventually get out of jail and would know that she gave the key to them.  (*Id.*)  Detective Kelly indicated that he would make sure that Plaintiff had a GPS monitor on his ankle.  (*Id.*)  Ms. Bryant stated that "[t]here's nothing I can do to stop you, is there?" (*Id.*)  Detective Kelly said no.  (*Id.*)  Ms. Bryant then said, "when he gets out, it's going to be so much worse."  (*Id.*)  Sergeant Laeng stated that "I know you don't want to do this, but it has to be done." (*Id.*)

Ms. Bryant then advised Detective Kelly and Sergeant Laeng that Plaintiff was probably asleep and explained where they should go to find him in the house.  (*Id.*)  Detective Kelly again asked for a key to the house.  (*Id.*)  Ms. Bryant stated "I don't have a choice."  (*Id.*)  Detective Kelly indicated that she did have a choice and explained that the officers could "make entry" to the house instead.  (*Id.*)  However, Ms. Bryant was concerned that she would then have to pay the landlord for any damages,[12] so she provided the officers with a key.  (*Id.*)

---

[12] Earlier during the traffic stop, Ms. Bryant explained that she and Plaintiff rented their home.  (*Id.* at 13:07.)

At approximately 1:22 p.m., Detective Kelly asked Ms. Bryant to stay away from the residence until he called to tell her that it was safe. (*Id.*) He also asked her not to alert Plaintiff to the fact that they were going to arrest him, and she promised not to do so. (*Id.*)

### D. Plaintiff is Arrested

At approximately 2:25 p.m. on October 19, 2022, Sergeant Laeng, Officer Quinn, Officer Douglas and at least one other unidentified officer arrested Plaintiff at his residence on the charge of domestic violence in violation of Ohio Rev. Code § 2919.25(A).[13] Video footage shows that Plaintiff asked why he was being arrested but was compliant with the Officers.[14]

The parties dispute whether the Officers obtained a warrant prior to arresting Plaintiff. Sergeant Laeng testified that, after conducting the traffic stop, "we filled out a, what we call, form seven warrant to have the judge or his designee sign to get the arrest warrant" and that he believed "the judge's designee, [Berea Court Administrator] Sta[c]ia Bellini signed a form seven warrant." (Laeng Depo. at Tr. 12.) Detective Kelly was not deposed in this action, but the record contains an Incident Report authored by Detective Kelly in which he states that, after the traffic stop of Ms. Bryant: "I returned to the station, completed a Form VII warrant on complaint against James K.

---

[13] Because of Plaintiff's 2003 conviction for domestic violence, his charge from the October 2022 incident was a felony of the fourth degree.

[14] Plaintiff's arrest was captured on the body cam footage of several of the Officers which was manually filed as "Exhibit 1" to Defendants' Motion for Summary Judgment and authenticated by Berea Chief of Police Dan Clark. *See* Doc. No. 31-1. Officer Quinn's body cam footage of Plaintiff's arrest (hereinafter "Quinn Video II") is captured in the video file ending in "00094070501_video0.mp4." Sergeant Laeng's body came footage of Plaintiff's arrest (hereinafter "Laeng Video III) is captured in the video file ending in "0129366345_video0.mp4." In addition, Plaintiff manually filed a DVD and flash drive containing a shortened version of one of the Officers' body cam footage of his arrest. *See* Doc. No. 35. The video file on the flash drive filed by Plaintiff is 31 seconds in length (time stamped from 14:34:42 to 14:34:58) and contains subtitles setting forth the conversation between the Officers and Plaintiff. It is not clear who inserted the subtitles into this footage.

Bryant for Domestic Violence against his wife, Cynthia D. Bryant" and that "Berea Court Administrator Stacia Bellini found that probable existed and she authorized the warrant." (Doc. No. 28 at PageID# 229.)  In addition, the record contains a "Warrant on Complaint"[15] (hereinafter "Arrest Warrant") which is dated October 19, 2022, and signed by Stacia Bellini, over a signature line that reads "Judge/Officer Designated by Judge/Clerk," with the words "Officer Designated" circled. (Doc. No. 31-2 at PageID# 281.)

Plaintiff, however, testified that one of the Officers acknowledged that they did not have a signed arrest warrant at the time of his arrest.  Specifically, Plaintiff testified that:

> When we got to the front door [of Plaintiff's residence], the one officer turned towards me and said I have a warrant that is written up here for your arrest but it hasn't been signed by the judge yet.  And that's when the light went off in my head, boom.  What you all doing in my house then?

(Bryant Depo. at Tr. 64-65.)  Plaintiff also directs this Court's attention to a specific portion of body cam footage from the arrest.  During this part of the footage (which occurs as Plaintiff is being escorted to the front door of his residence in handcuffs), Sergeant Laeng can be seen showing papers to the Plaintiff and saying "We have copies of the warrant that we typed up for the judge to sign when we get back to the station if you want to read it." (Laeng Video III at 14:34:42 - :58.)  *See also* Arrest Body Cam Footage filed by Plaintiff at 14:34:42 to 14:34:58.

    **E.**    **Underlying Criminal Proceedings**

---

[15] The record also contains a "Complaint by Individual" and "Affidavit for Determining Probable Cause," both of which are signed by Detective Kelly and dated October 19, 2022.  (Doc. No. 31-2 at PageID# 282; Doc. No. 28 at PageID# 220.)  The Complaint and Probable Cause Affidavit are notarized and signed by Stacia Bellini over a signature line that reads "Judge/Deputy Clerk/Officer Designated by Judge/Peace Officer Authorized by R.C. 2935.081," with the words "Clerk/Officer" circled.  (*Id.*)  The Complaint charges Plaintiff with Domestic Violence in violation of Ohio Rev. Code § 2919.25(A), a felony of the fourth degree due to his previous conviction for domestic violence in 2003.  (Doc. No. 31-2 at PageID# 282.)

After his arrest, Plaintiff was taken to the Berea Police station for processing and then transported to the North Royalton jail.  (Laeng Depo. at Tr. 13; Douglas Depo. at Tr. 28-29.)  Officer Douglas completed an Incident/Offense Report later that day regarding the October 19, 2022 incident, which included information that he had gathered from Officer Santos and Detective Kelly.  (Douglas Depo. at Tr. 35-36; Doc. No. 28 at PageID#s 224-225.)  Sergeant Laeng and Detective Kelly also completed separate Investigative Reports regarding the incident.  (Doc. No. 28 at PageID#s 228-229.)  Lastly, Ms. Bryant prepared a written Statement on October 19, 2022, in which she described the incident giving rise to the charges against Plaintiff.  (Doc. No. 27 at PageID#s 182-185.)  Among other things, Ms. Bryant wrote that Plaintiff "started to punch me in the head" and "kept her phone" on October 19, 2022.  (*Id.* at PageID# 183.)

The docket from Plaintiff's underlying criminal proceedings reflects that he was arraigned in the Berea Municipal Court on October 20, 2022.  (Doc. No. 31-2 at PageID# 284.)  On that date, the Municipal Court entered a temporary protection order ("TPO"), ordered GPS monitoring, and set bond at $10,000.  (*Id.*)  Plaintiff was declared indigent and appointed counsel.  (*Id.*)  He waived his right to a preliminary hearing and the matter was bound over to the Cuyahoga County Court of Common Pleas.  (*Id.*)  Notably, the Municipal Court docket indicates that Plaintiff was "detained upon: Warrant on Complaint issued on 10/19/22 by Bellini."  (*Id.*)

Plaintiff had his first appearance in the Cuyahoga County Court of Common Pleas on October 24, 2022.  *See State of Ohio v. James Bryant,* Cuyahoga County Court of Common Pleas Case No. CR-22-675358 (Docket).  The state trial court set bond at $5,000; continued the TPO; and set various bond conditions, including GPS monitoring.  (*Id.*)  The state court docket reflects that Plaintiff posted bond on November 7, 2022.  (*Id.*)  Shortly thereafter, on November 15, 2022, the grand jury returned

14

an indictment against Plaintiff for one count of Domestic Violence in violation of Ohio Rev. Code § 2919.25(A), a felony of the fourth degree. (*Id*.)

Plaintiff was arraigned in the state trial court on December 6, 2022, at which time he pled not guilty. (*Id*.) Plaintiff later filed a motion to remove the GPS monitoring ankle bracelet due to his severe peripheral neuropathy, which the trial court granted on February 21, 2023. (*Id*.) The state court docket also reflects that Plaintiff filed a Motion to Suppress, in which he argued that the Officers did not have probable cause to arrest him on October 19, 2022. (*Id*.) The State opposed the Motion. (*Id*.) The trial court set a hearing on Plaintiff's Motion to Suppress for May 10, 2023. (*Id*.)

In April 2023, however, Ms. Bryant passed away. (Doc. No. 27 at PageID# 173.) The state court docket reflects that the trial court did not conduct a hearing on Plaintiff's Motion to Suppress on May 10, 2023. *See State of Ohio v. James Bryant,* Cuyahoga County Court of Common Pleas Case No. CR-22-675358 (Docket). Instead, on that date, the criminal case against Plaintiff was dismissed without prejudice. (*Id*.)

## II. Procedural History

On October 16, 2023, Plaintiff filed a Complaint in this Court against (1) the City of Berea; (2) the City of Berea Police Department; and (3) Officers Kelly, Laeng, Santos, Douglas, and Quinn. (Doc. No. 1.) Therein, Plaintiff asserts two claims under 42 U.S.C. § 1983, the first against Officers Kelly, Laeng, Santos, Douglas, and Quinn (hereinafter "the Officer Defendants") (Count One) and the second against the City of Berea (Count Two). (*Id*. at PageID#s 3-4.) Plaintiff also alleges state law claims for intentional infliction of emotional distress (Count Three) and malicious prosecution (Count Four). (*Id*. at PageID#s 4-5.)

15

Defendants filed an Answer on November 7, 2023.  (Doc. No. 6.)  The Court conducted a Case Management Conference ("CMC") on December 19, 2023, during which various case management deadlines were set.  (Doc. No. 20.)

On November 14, 2024, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims.  (Doc. No. 31.)  Plaintiff filed a Brief in Opposition on December 16, 2024, to which Defendants replied on December 30, 2024.  (Doc. Nos. 34, 36.)  On January 3, 2025, Plaintiff filed a Motion for Leave to File Sur-Reply Instanter.  (Doc. No. 37.)  Defendants opposed the Motion on January 8, 2025.  (Doc. No. 38.)  Plaintiff did not file a Reply Brief in support of his Motion for Leave to File Sur-Reply.

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there

is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc*., 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp*., 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems*., 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

There is an "added wrinkle" where, as here, there is video evidence.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007).  As the Sixth Circuit has explained, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380).  However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.  See also Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

**IV.    Analysis**

17

### A.  Motion for Leave to File Sur-Reply (Doc. No. 37)

The Court first addresses Plaintiff's Motion for Leave to File Sur-Reply, Instanter.  (Doc. No. 37.)  Therein, Plaintiff requests leave to file his proposed Sur-Reply (which is attached as an Exhibit to the Motion) on the grounds that Defendants "stated several significant and material misstatements of fact [in their Reply Brief], and if not addressed could prove to be prejudicial to Plaintiff."  (*Id*.)  In his proposed Sur-Reply, Plaintiff addresses Defendants' reliance on Officer Kelly's statement that the arrest warrant was "authorized" by Ms. Bellini, as well as Defendants' argument that the arrest warrant is valid under Ohio Crim. R. 4.  (Doc. No. 37-1.)  Plaintiff also argues, at some length, that Ms. Bryant did not voluntarily consent to the Officers' entry into the Bryants' residence.  (*Id*. at PageID#s 329-332.)  Rather, he asserts that Sergeant Laeng and Officer Kelly "intimidated and coerced" Ms. Bryant into accusing Plaintiff of hitting her on October 19, 2022 and providing consent to enter the Bryants' premises.  (*Id*.)  In connection with this argument, Plaintiff provides a lengthy chart in which he identifies (by time stamp) thirty-one (31) specific examples of alleged "coercion" during Ms. Bryant's traffic stop.  (*Id*. at PageID#s 329-332.)

In response, Defendants argue that Plaintiff should not be granted leave to file a Sur-Reply because Plaintiff provides no explanation why he could not have addressed these issues (or provided his chart) in his Brief in Opposition.  (Doc. No. 38 at PageID# 335.)  Defendants maintain that Plaintiff raised both issues (i.e., that the warrant was not signed and that Ms. Bryant was coerced) in his Brief in Opposition but "simply did not flesh out the same."  (*Id*.)  Defendants argue that Plaintiff's proposed Sur-Reply is an inappropriate attempt to have a "second bite at the apple" and that allowing Plaintiff to "have the last word" would be prejudicial to Defendants.  (*Id*.)

"Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cty*., 551 Fed. Appx 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth*., 339 F.3d 454, 481 (6th Cir. 2003)); *accord Eldridge v. Cardif Life Ins. Co*., 266 F.R.D. 173, 175 (N.D. Ohio 2010) ("This Court grants leave to file a sur-reply to afford a party an opportunity to address new issues raised for the first time in the reply.") However, when a reply does not include new arguments or evidence, a sur-reply is "an impermissible attempt to have the last word." *Attractive Surgical, LLC v. Cleveland Clinic Found*., 2019 WL 11075734 at *4 (N.D. Ohio Oct. 31, 2019). The decision of whether to allow a sur-reply is "left to the broad discretion of the trial court." *Carter v. Paschall Truck Lines, Inc*., 364 F.Supp.3d 732, 748 (W.D. Ky. 2019).

Here, the Court finds that Plaintiff has not demonstrated that a sur-reply is warranted with respect to the issue of whether the arrest warrant was signed at the time of Plaintiff's arrest. In their Motion for Summary Judgment, Defendants expressly argue that "there was a validly executed warranted issued for Ms. Bryant's arrest" and attach a copy of that warrant to its Motion as an Exhibit. (Doc. No. 31 at Page ID# 272; Doc. No. 31-2 at PageID# 281.) Defendants also discuss Officer Kelly's Affidavit for Determining Probable Cause, in which he describes obtaining the arrest warrant prior to executing Plaintiff's arrest.[16] (*Id*. at PageID# 264.) In his Brief in Opposition, Plaintiff argues that the officers "failed to get authorization for the warrant prior to the intrusion into the Bryant

---

[16] Officer Kelly's Affidavit for Determining Probable cause is attached as an Exhibit to Plaintiff's deposition transcript. *See* Doc. No. 27 at PageID# 179.

residence" but does not offer any further discussion or citation to legal authority in support of this argument. (Doc. No. 34 at PageID# 293.) Defendants address Plaintiff's argument regarding the arrest warrant in their Reply Brief but do not rely on any new evidence. Upon review, the Court finds that Plaintiff has failed to demonstrate that a sur-reply is warranted or necessary with respect to the issue of whether the arrest warrant was signed. Rather, as to this issue, Plaintiff's proposed Sur-Reply as nothing more than "an impermissible attempt to have the last word." *Attractive Surgical, LLC,* 2019 WL 11075734 at *4.

For the following reasons, however, the Court will consider the arguments in Plaintiff's proposed Sur-Reply relating to the issue of consent. In their Reply Brief, Defendants raise, for the first time, the legal argument that the Officers had consent to enter the residence from a co-tenant, i.e., Ms. Bryant. (Doc. No. 36 at PageID#s 322- 323.) Defendants cite and discuss several Supreme Court decisions regarding consent by a co-tenant (none of which were cited in their Motion) and argue that, pursuant to those decisions, Ms. Bryant was authorized to provide consent to the Officers to enter the residence on October 19, 2022 to arrest Plaintiff. (*Id*.) Plaintiff's proposed Sur-Reply addresses this new legal argument and argues, at length, that Ms. Bryant did not voluntarily consent to the Officers' entry to the premises. (Doc. No. 37-1 at PageID#s 329-333.) Upon review, and in the exercise of its discretion, the Court will consider the section of Plaintiff's Sur-Reply (*Id*. at PageID#s 329-333) relating to the issue of voluntary consent, as it is responsive to a new legal argument raised by Defendants in their Reply Brief.

Accordingly, Plaintiff's Motion for Leave to file Sur-reply, Instanter (Doc. No. 37) is granted in part and denied in part, as set forth above.

### B.    Defendants' Motion for Summary Judgment

1.      **Claims against the Defendant City of Berea Police Department**

In their Motion for Summary Judgment, Defendants first argue that Plaintiff's federal and state claims against Defendant City of Berea Police Department (hereinafter "Defendant BPD") fail as a matter of law because a municipal police department is not *sui juris*.  (Doc. No. 31 at PageID# 268.)  Plaintiff fails to acknowledge or address this issue at any point in his Brief in Opposition.  (Doc. No. 34.)

Considering Plaintiff's lack of opposition, the Court finds that Plaintiff has abandoned his federal and state claims against Defendant BPD.  *See Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564 n.1 (6th Cir. 2021) (plaintiff abandoned claims not discussed in opposition to motion for summary judgment or on appeal); *Brown v. VHS of Mich., Inc.*, 545 Fed. Appx 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").  *See also Lisan v. Wilkie*, 835 Fed. Appx 831, 834–35 (6th Cir. 2020); *Nowlin v. Nova Nordisk Inc.*, 2018 WL 1805141 at *3 (6th Cir. Feb. 28, 2018); *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 Fed. Appx 567, 568 (6th Cir. 2015); *Hicks v. Concorde Career Coll.,* 449 Fed. Appx 484, 487 (6th Cir. 2011).

Moreover, even if this Court were to address this issue on the merits, the Court would find that Defendant BPD is entitled to summary judgment in its favor with respect to Plaintiff's claims as a matter of law.  As Defendants correctly note, it is well established that municipal police departments (such as Defendant BPD) are not *sui juris*, i.e., they are not entities subject to suit under either 42 U.S.C. § 1983 or Ohio law.  *See, e.g., Lawson v. City of Youngstown*, 912 F.Supp.2d 527, 531 (N.D. Ohio 2012) (collecting cases and holding that Ohio police departments are not *sui juris* for purposes

21

of suit under § 1983); *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) ("We note at the outset that the named defendant in this action, the Police Department of the City of Zanesville, is not a juridical entity subject to suit under Ohio law."); *Lloyd v. City of Streetsboro*, 2018 WL 11298664 at *3 (6th Cir.) ("We have held that, under Ohio law, sheriff's and police departments are not entities capable of being sued under § 1983.")  Indeed, courts routinely grant police departments' motions for summary judgment on this basis. *See, e.g., Marshall v. Toledo Police Department*, 2024 WL 3819624 at * 2 (N.D. Ohio Aug. 14, 2024) (collecting cases); *Mason v. Holmes*, 2014 WL 696418 at *11 (N.D. Ohio Feb. 24, 2014); *Greenlee v. City of Cleveland*, 2005 WL 2249920 at *7 (N.D. Ohio Sept. 15, 2005).

Accordingly, and for all the reasons set forth above, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's claims against Defendant BPD.  Defendant BPD is hereby dismissed.

### 2.    Federal Claims

The Court next addresses Defendant City of Berea's and the Officer Defendants' arguments that they are entitled to summary judgment in their favor with respect to Plaintiff's federal claims under 42 U.S.C. § 1983.  (Doc. No. 31 at PageID#s 268-274.)  Plaintiff's federal claims are set forth in Counts One and Two of the Complaint.  In Count One (which is captioned "Violation of Civil Rights under 42 U.S.C. § 1983"), Plaintiff alleges that the Officer Defendants "are persons who acted under color of state law to deprive Plaintiff of basic constitutional rights."  (Doc. No. 1 at ¶ 7.)  Plaintiff further alleges that "[a]s a direct result of Defendant officers' actions, Plaintiff has suffered, and will continue to suffer, physical and mental injuries, and has incurred, and will incur in the future medical, hospital, doctor, and prescription drug expenses."  (*Id*. at ¶ 8.)

22

In Count Two (also captioned "Violation of Civil Rights under 42 U.S.C. § 1983"), Plaintiff alleges that he "reasonably believes that Defendant City of Berea maintains a policy or practice that approves of such conduct by its police officers." (*Id*. at ¶ 11.)  Plaintiff further alleges that "[a]s a direct result of such policy or practice on the part of Defendant City of Berea, Plaintiff has suffered, and will continue to suffer, physical and mental injuries; and has incurred, and will incur in the future, medical, hospital, doctor, and prescription drug expenses." (*Id*. at ¶ 12.)  Lastly, Plaintiff alleges that "such policy or practice has the effect of depriving this Plaintiff of his constitutional rights in violation of 42 USC §1983, such that Plaintiff has been damaged in an amount in excess of $25,000.00." (*Id*. at ¶ 13.)

### a.     Count Two – *Monell* Claim against Defendant City of Berea

The Court begins by addressing Plaintiff's *Monell* claim against Defendant City of Berea in Count Two.  A plaintiff may not sue a local government entity, such as the City of Berea, for injuries inflicted solely by its employees or agents under § 1983.  *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  *See also Baynes v. Cleland*, 799 F.3d 600, 622 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012).  Rather, a plaintiff may only hold a government entity liable under § 1983 for that entity's own wrongdoing.  *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*.")  Or, as the Sixth Circuit has explained, a government entity "is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the "moving force" behind the injury alleged.'"  *D'Ambrosio*, 747 F.3d at 388-89 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

23

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  In the Sixth Circuit, a plaintiff may hold a government entity liable under four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  *See also D'Ambrosio*, 747 F.3d at 386.

Here, Defendant City of Berea argues that it is entitled to summary judgment in its favor with respect to Count Two because Plaintiff has failed to identify any custom or policy that would subject it to liability under *Monell*.  (Doc. No. 31 at PageID# 269-270.)  Plaintiff fails to acknowledge or address this argument at this issue at any point in his Brief in Opposition.  (Doc. No. 34.)  Notably, Plaintiff does not identify (or direct this Court's attention to any evidence regarding) any official policy or custom of the City of Berea that he believes resulted in the deprivation of his constitutional rights.  Plaintiff also fails to argue (or direct this Court's attention to any evidence) that a City of Berea official with final decision-making authority ratified the allegedly illegal actions of the Officer Defendants.

In light of the above, the Court finds that Plaintiff has abandoned his *Monell* claim against Defendant City of Berea as set forth in Count Two.  *See Nathan*, 992 F.3d at 564 n.1; *Dulaney*, 2021 WL 3719358 at * 5; *Brown*, 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Nowlin*, 2018

24

WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks,* 449 Fed. Appx at 487.  Accordingly,

Defendants' Motion for Summary Judgment with respect to Count Two is granted.[17]

      **b.**      **Count One—Individual Capacity Claims against the Officer Defendants**

The Court next addresses the Officer Defendants' argument that they are entitled to summary

judgment in their favor with respect to Plaintiff's § 1983 claims as set forth in Count One.  As noted

*supra*, in that Count, Plaintiff alleges (summarily) that Officers Kelly, Laeng, Santos, Douglas and

Quinn "acted under color of state law to deprive Plaintiff of basic constitutional rights."  (Doc. No. 1

at ¶ 7.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived

of a right secured by the Constitution or the laws of the United States, and that the deprivation was

caused by a person acting under color of state law.[18]  *See West v. Atkins*, 487 U.S. 42, 48 (1988);

*Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  As the Supreme

Court has explained, Section 1983 "is not itself a source of substantive rights," but merely provides

"a method for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137,

144, n. 3 (1979).  *See also Albright v. Oliver*, 510 U.S. 266, 271 (1994).  "The first step in any such

---

[17] To the extent the Complaint alleges any official capacity claims against the Officer Defendants, those claims are also dismissed.  "[A]n official-capacity claim is merely another name for a claim against the municipality" or other government entity.  *Essex v. Cty. Of Livingston*, 518 Fed. Appx. 351, 354 (6th Cir. 2013) (citing *Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009)); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("An action premised on an official-capacity claim "is not a suit against the official but rather is a suit against the official's office.") To succeed on a § 1983 official capacity claim, a plaintiff must allege that a policy or custom of the governmental entity is responsible for his or her injuries.  *Direct Construction Services LLC v. City of Detroit, Michigan*, 820 Fed. Appx. 417, 426 (6th Cir. 2020).  Because this Court has dismissed Plaintiff's § 1983 claim against the City of Berea for failure to identify (or introduce any evidence regarding) an official policy or custom that is responsible for his injuries, any official capacity claims against the Officer Defendants are likewise without merit and dismissed.

[18] Here, the parties do not dispute that the Officer Defendants were acting under color of state law at all times relevant to the instant action.

claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271. *See also Moniz v. Cox*, 512 Fed. Appx. 495, 498 (6th Cir. 2013); *Johnson v. Clark*, 2024 WL 970724 at * 3 (N.D. Ohio Mar. 5, 2024).

In the instant case, Plaintiff fails to identify, at any point in the Complaint, which "basic constitutional right" he believes the Officer Defendants violated.  The Officer Defendants argue that this is fatal to his § 1983 claim, asserting that "it is not enough to merely allege that § 1983 was violated, a plaintiff must still set forth a specific constitutional right of which he was deprived." (Doc. No. 31 at PageID# 268.)  Plaintiff fails to acknowledge or address the Officer Defendants' argument that they are entitled to summary judgment because the Complaint fails to sufficiently plead the specific constitutional right(s) that Plaintiff believes the Officer Defendants violated.  (Doc. No. 34.) Plaintiff does, however, proceed to argue in his Brief in Opposition that Defendants violated his Fourth Amendment rights when they wrongfully arrested and prosecuted him without probable cause. (*Id*. at PageID#s 293-297.)

Neither party addresses whether, or under what circumstances, it is appropriate for a district court to grant summary judgment to a defendant based on an alleged pleading deficiency in the complaint.  Based on its own research, the Court finds that, under the circumstances presented, it would not be appropriate to grant summary judgment to the Officer Defendants on this basis.  As the Sixth Circuit has explained, "challenges to the sufficiency of the pleadings must be asserted in a motion to dismiss under Rule 12(b)(6) rather than on summary judgment." *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 n.2 (6th Cir. 2014).  *See also Spadafore v. Gardner*, 330 F.3d 849, 852-853 (6th Cir. 2003) (in § 1983 action, stating that, at the summary judgement stage, "[t]he question

of whether the pleadings were fatally insufficient is [] no longer the correct inquiry"); *Cornelius v. City of Mount Washington, Kentucky*, 2021 WL 3082246 at * 8, fn 10 (W.D. Ky. July 21, 2021).

Here, the Officer Defendants could have challenged the sufficiency of Plaintiff's Complaint by filing a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or a Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c).  The Officer Defendants failed to do so and the Court is not inclined to dismiss Plaintiff's § 1983 claims at the summary judgment stage on the basis of an alleged pleading deficiency, particularly where Plaintiff clearly asserted a claim against the Officer Defendants under § 1983 in the Complaint and identified the specific nature of that claim during discovery[19] and in his Brief in Opposition to Defendants' Motion for Summary Judgment.  Moreover, the Officer Defendants do not argue that they were not on notice that Plaintiff intended to pursue § 1983 claims for false arrest and malicious prosecution in violation of the Fourth Amendment.  (Doc. No. 31.)  To the contrary, Defendants expressly address and seek summary judgment on these very claims in their Motion.  (*Id*. at PageID#s 270-274.)

Accordingly, the Court will proceed to address whether there is a genuine issue of material fact that the Officer Defendants deprived Plaintiff of his federal constitutional rights under the Fourth Amendment when they arrested and prosecuted him as a result of the October 19, 2022 incident.

### i.    False Arrest

The Officer Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's § 1983 claim for false arrest.  (Doc. No. 31 at PageID# 270.)  Government officials "are

---

[19] Defendants' Interrogatory No. Three asked Plaintiff to identify "each act and/or omission which you claim subjects the defendants to liability and/or any other ground for recovery against each defendant as alleged in the complaint."  (Doc. No. 27 at PageID# 149.)  Plaintiff responded, in relevant part, that he was "wrongfully arrested" on October 19, 2022. (*Id*.)

immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). To determine whether a government official is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the [official]'s conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.* These steps may be addressed in any order, and the defendant official need only prevail on one of them to be granted qualified immunity. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable government official would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). In evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the particular situation that [the defendants] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020).

The Court begins by considering whether the facts, when taken in the light most favorable to Plaintiff, show that the Officer Defendants' conduct violated Plaintiff's Fourth Amendment rights when they arrested him on October 19, 2022. The Fourth Amendment protects citizens from "unreasonable searches and seizures" and requires warrants to be issued "upon probable cause." U.S. Const. Amend. IV. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412

F.3d 669, 677 (6th Cir. 2005).  As the Sixth Circuit has explained, "[a]n arrest is supported by the requisite probable cause when, at the time of the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he or she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  *See also Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Wesby*, 583 U.S. at 57 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, n.13 (1983)).  "A showing of 'probable cause provides a complete defense to a claim of false arrest.'"  *Tlapanco,* 969 F.3d at 652 (quoting *Halasah v. City of Kirtland*, 574 Fed. Appx. 624, 629 (6th Cir. 2014)).

    Here, the Officer Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's false arrest claim for multiple reasons.  (Doc. No. 31 at PageID#s 270-274.) Specifically, the Officer Defendants argue that (1) Plaintiff conceded the existence of probable cause when he waived his right to a preliminary hearing; (2) the Berea Municipal Court found that Plaintiff's arrest was "warranted" and this Court should accord deference to that finding; (3) even if Plaintiff did not concede the existence of probable cause by waiving his right to a preliminary hearing, Plaintiff was arrested pursuant to a facially valid arrest warrant that is supported by probable cause; and (4) even if the warrant was "somehow invalid," there was ample probable cause to arrest Plaintiff on October 19, 2022 and, in any event, Ms. Bryant consented to the Officers' entry when she provided a key to the Bryant residence.  (*Id*.)  The Court will address the Officer Defendants' arguments in turn, below.

**aa.**    **Waiver of Preliminary Hearing/Berea
Municipal Court Docket Entry**

The Officer Defendants first argue that Plaintiff "conceded the existence of probable cause" when he signed a Waiver of Preliminary Hearing on October 20, 2022.  (Doc. No. 31 at PageID#s 270-274.)  The Officer Defendants further argue that the Berea Municipal Court's docket entry for October 20, 2022 "includes a finding by the criminal court that [Plaintiff's] arrest was 'warranted,' i.e., that probable cause existed."  (*Id.* at PageID# 271, fn 6.)  The Officer Defendants assert that the Municipal Court's "finding" indicates that that court determined that probable cause existed for Plaintiff's arrest and is entitled to preclusive effect in these proceedings.  (*Id.*)  Plaintiff does not acknowledge or address either of these arguments in his Brief in Opposition.  (Doc. No. 34.)

For the following reasons, the Court is not inclined to grant summary judgment in favor of the Officer Defendants on either of these grounds.  Although Plaintiff does not respond to these issues in his Brief in Opposition, the Court is not persuaded by the authority cited by the Officer Defendants that Plaintiff conceded the existence of probable cause for purposes of his § 1983 false arrest claim when he waived his preliminary hearing in Berea Municipal Court.  Both cases cited by the Officer Defendants for this proposition are unreported district court decisions in federal criminal cases.  *See United States v. Shelton*, 2024 WL 3997455 at * 1 (E.D. Tenn. Aug. 29, 2024); *United States v. Little*, 2019 WL 2720215 at * 2 (E.D. Ky. June 10, 2019).  Neither case involves, or addresses, whether a civil rights plaintiff concedes the existence of probable cause for purposes of a § 1983 false arrest

30

claim when he waives a preliminary hearing in municipal court.[20]  And the Court is not required, or inclined, to search for case law on the Officer Defendants' behalf that might support this argument.

The Court also declines to grant summary judgment in favor of the Officer Defendants on the sole basis of an entry on the Berea Municipal Court docket sheet that Plaintiff's "detention [is] warranted."  (Doc. No. 31-2 at PageID# 284.)  The Officer Defendants characterize this entry as "a finding by the criminal Court that the arrest was 'warranted,' i.e., that probable cause existed" and argue that this Court must accord deference to this finding.  (Doc. No. 31 at PageID# 271, fn 6.)  The Court is not convinced that summary judgment on Plaintiff's § 1983 false arrest claim is warranted solely based on an unexplained state court docket entry that states "detention warranted."  Additionally, the authority cited by the Officer Defendants in support of this argument is distinguishable from the instant matter.  The Officer Defendants first rely on *Walden v. Bullitt County, Kentucky*, 2011 WL 4587480 at * 2 (W.D. Ky. Sept, 30, 2011), in which the district court deferred to the state court's finding of probable cause for purposes of plaintiff's § 1983 false arrest claim where the state trial court expressly determined that probable cause existed after conducting a hearing.  Here, however, there was no probable cause hearing or other clear determination by the Municipal Court that Plaintiff's arrest was supported by probable cause.

The Officer Defendants' reliance on *Buttino v. City of Hamtramck*, 87 Fed. Appx. 499 (6th Cir. 2004) is similarly misplaced.  In that case, the Sixth Circuit affirmed a district court decision granting summary judgment to the defendants on the ground that the state trial court's ruling in a preliminary hearing that there was probable cause precluded plaintiff from relitigating the issue of

---

[20] Moreover, neither of the two cases cited by Defendants cite any authority (much less binding Sixth Circuit authority) in support of the position that a criminal defendant concedes the existence of probable cause for all purposes by waiving a preliminary hearing.

probable cause in his subsequent § 1983 action.  Again, and unlike the instant case, the state trial court in *Buttino* conducted a lengthy hearing before determining that probable cause existed.  In affirming the district court's deference to the state court's probable cause determination, the Sixth Circuit noted that "'where a state affords an opportunity for an accused to contest probable cause at a preliminary hearing *and the accused does so*, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action.'" *Id.* at 503 (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 174-175 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. Of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001)) (emphasis added).

In sum, the Officer Defendants do not direct this Court's attention to any authority that, under the specific circumstances presented herein, it would be appropriate for this Court to construe the Municipal Court's docket entry that "detention [is] warranted" as a finding of probable cause and, further, to accord preclusive effect to that "finding."  Thus, although Plaintiff did not oppose this argument in his Brief in Opposition, the Court is not inclined to grant summary judgment in the Officer Defendants' favor on this basis alone.

### bb.    Arrest Warrant

Turning to the merits, the Officer Defendants argue that there is no genuine issue of material fact that probable cause existed in this case.  (Doc. No. 31 at PageID# 272.)  The Officer Defendants emphasize that there "was a validly executed warrant issued for Mr. Bryant's arrest."  (*Id.* at PageID# 273-274.)  They maintain that the warrant is supported by probable cause in light of the "credible and reliable evidence obtained from the 911 caller," information obtained from Mrs. Bryant's son, the Officers' own observed interactions with Mr. and Mrs. Bryant, and "most importantly, Mrs. Bryant's own words wherein she told them about the abuse she was enduring at home."  (*Id.*)  Based on the

above, the Officer Defendants argue that "Plaintiff cannot possibly show that a clearly established right of his was violated." (*Id*. at PageID# 274.)

Plaintiff maintains that "the intrusion into his home on October 19, 2022 was a violation of the Fourth Amendment because it was done without a warrant." (Doc. No. 34 at PageID#s 293, 297.) Specifically, Plaintiff asserts as follows:

> Though the officers had paperwork to get a warrant they failed to get authorization for the warrant prior to the intrusion into the Bryant residence. The officer admitted as much when he said to Plaintiff Bryant that he could have a copy of the warrant that they were going to get the judge to sign. Failure to have the warrant authorized is the same as having no warrant at all. Plaintiff Bryant's arrest without a warrant was illegal *per se*.

(*Id*. at PageID# 293.) Plaintiff further asserts that "the police officers lacked probable cause for the arrest owing to the coercion practiced upon his wife to intimidate her into giving them what they wanted in order to effect an arrest." (*Id*. at PageID# 297.) Plaintiff argues that the traffic stop of Ms. Bryant's vehicle (which lasted nearly thirty minutes) was "[a] ruse in order to question her at length and give her the distinct impression that she had no choice but to authorize them to arrest her husband for domestic violence, despite her numerous entreaties not to arrest him." (*Id*. at PageID# 290.) Based on the above, Plaintiff argues that "qualified immunity is not available to defendants to shield them from liability." (*Id*. at PageID# 297.)

In their Reply Brief, the Officer Defendants dispute Plaintiff's argument that the arrest warrant was not signed prior to his arrest. (Doc. No. 36 at PageID# 309.) Defendants note that Officer Kelly's Investigative Report (Doc. No. 28 at PageID# 229) confirms that, after the traffic stop of Ms. Bryant: (1) he returned to the station and prepared the "Form VII warrant on complaint" (2) "Berea Court Administrator Stacia Bellini found that probable cause existed and she authorized the warrant;" and (3) he then responded with patrol officers to the Bryant residence and effectuated Plaintiff's arrest.

33

(Doc. No. 36 at PageID# 311.)  Defendants assert that this sequence of events was confirmed by Sergeant Laeng and Officer Santos during their depositions, as well as by the time stamps of the body cam footage discussed *supra*. (*Id*.) Defendants insist that the body cam footage submitted by Plaintiff does not show that Sergeant Laeng stated that the warrant had not yet been signed.  (*Id*. at PageID# 312.)  Defendants argue that the only evidence that the warrant was not signed at the time of arrest is Plaintiff's own "self-serving affidavit" and deposition testimony, which Defendants argue this Court should disregard based on Plaintiff's lack of personal knowledge.  (*Id*. at PageID# 312, 318-319.)

The Officer Defendants further argue that the arrest warrant is valid because Ohio Crim. R. 4(A)(1) expressly permits warrants issued upon complaints to be issued by a judge or "officer of the court designated by the judge." (*Id*. at PageID# 320.) Defendants assert that, in this case, Ms. Bellini was the judge's designee and that she properly executed the warrant prior to Plaintiff's arrest.  (*Id*. at PageID# 320-321.)  The Officer Defendants further maintain that Ohio Crim. R. 4(C)(1) "does not require that a warrant be signed" and that "plaintiff has not identified any federal case law specifically setting forth that a warrant must be signed for an arrest to be constitutional and defendants are not aware of any." (*Id*. at PageID#s 321-322.)

Under Sixth Circuit precedent, "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." *Robertson v. Lucas*, 753 F3d 606, 618 (6th Cir. 2014) (quoting *Voyticky*, 412 F.3d at 677).  As noted *supra*, here, Plaintiff argues that the Officer Defendants did not have a facially valid warrant at the time of his arrest.  (Doc. No. 34 at PageID# 293.)  The precise nature of Plaintiff's argument, however, is not entirely clear.

Defendants interpret Plaintiff's Brief in Opposition as arguing that the arrest warrant was not valid because it was signed by Berea Municipal Court Administrator Stacia Bellini, rather than by a Municipal Court judge or magistrate judge. To the extent Plaintiff is, in fact, arguing that the arrest warrant is not facially valid because it was signed and/or authorized by Ms. Bellini (rather than a judge), the Court finds this argument to be without merit. The Sixth Circuit has determined that "'Ohio law expressly permits a clerk of court to issue an arrest warrant.'"[21] *Peroli v. Huber*, 2021 WL 5411215 at * 9 (6th Cir. Nov. 19, 2021) (quoting *Gooden v. City of Brunswick,* 2014 WL 1379528 at *9 (N.D. Ohio Apr. 8, 2014)). *See also Fry v. Robinson*, 678 Fed. Appx. 313, 318-319 (6th Cir. 2017) ("Ordinarily, arrest warrants issued by court clerks in Ohio are considered facially valid, entitling an officer to qualified immunity where he or she relies on the judicially secured warrant."); *Sampson v. City of Xenia*, 108 F.Supp.2d 821, 836 (S.D. Ohio 1999) (holding that "[u]nder Ohio law, a clerk of courts or deputy clerk of courts may make a probable cause determination and issue an arrest warrant"); *Carrasquillo v. City of Cleveland*, 2011 WL 3841995 at * 4 (N.D. Ohio Aug. 30, 2011) (noting that "Ohio law expressly permits a clerk of court to issue felony warrants, trusting they will not merely rubber-stamp a police officer and prosecutor's probable cause findings.").[22]

---

[21] In *Shadwick v. City of Tampa*, 407 U.S. 345 (1972), the Supreme Court found that an individual with authority to issue an arrest warrant must meet two tests: "[she] must be neutral and detached, and [she] must be capable of determining whether probable cause exists for the requested arrest or search." *Id.* at 350. Here, Plaintiff does not argue (or present any evidence) that Berea Court Administrator Bellini failed to satisfy either of these tests. Thus, the Court deems this issue waived.

[22] *See also* Ohio Crim. R. 4(A)(1) ("If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed, and that the defendant has committed it, a warrant for the arrest of the defendant, or a summons in lieu of a warrant, shall be issued by a judge, magistrate, clerk of court, or officer of the court designated by the judge, to any law enforcement officer authorized by law to execute or serve it.")

Plaintiff also appears to be arguing, however, that there is a genuine issue of material fact regarding whether the arrest warrant at issue was, in fact, signed and/or authorized by Ms. Bellini at the time of his arrest.  (Doc. No. 34 at PageID# 290-291.)  In support of this argument, Plaintiff submits an Affidavit, in which he avers the following regarding his arrest on October 19, 2022:

> 7.    Mr. Bryant went to bed and was awakened by a host of officers with guns drawn in his bedroom who pulled him out of bed and took him to jail.
>
> 8.    In the foyer of his residence, as he was being escorted out of his residence, he was told by one officer that he was being arrested for domestic violence and then immediately afterward he was told by Officer Laeng, "we have copies of the warrant that we typed up for the judge to sign."
>
> 9.    At his deposition James Bryant testified as follows: "[w]hen we got to the front door, the one officer turned toward me and said I have a warrant that is written up here for your arrest but it hasn't been signed by the judge yet. And that's when the light went off in my head, boom. What you all doing in my house then?" James Bryant deposition August 19, 2024 at page 64, lines 22-25, and page 65, lines 1-4.

(J. Bryant Aff. (Doc. No. 34-2) at ¶¶ 7-9.)[23]  In addition, Plaintiff directs this Court's attention to body cam footage of the moment during his arrest when he was being escorted out of his residence. During this part of the footage, Sergeant Laeng can be seen showing papers to the Plaintiff and stating "We have copies of the warrant that we typed up for the judge to sign when we get back to the station if you want to read it."  (Laeng Video III at 14:34:42 - :58.)  *See also* Arrest Body Cam Footage filed by Plaintiff at 14:34:42 to 14:34:58.

---

[23] Defendants argue that the Court should disregard this portion of Plaintiff's Affidavit because he "was not present when the warrant was being drawn up by the Berea Police Department personnel and then executed by the Judge's designee, Ms. Bellini and, thus, he does not have the personal knowledge necessary to say that the same was unsigned." (Doc. No. 36 at PageID# 319.)  The Court disagrees.  In the averments set forth above, Plaintiff relates his recollection of his arrest and the words that he recalls Officer Laeng said to him as they were leading him out of his foyer.  Plaintiff has personal knowledge of this event and, therefore, the Court will not disregard Paragraphs 7, 8, or 9 of his Affidavit.

In response, the Officer Defendants argue that Officer Kelly's Investigative Report and the deposition testimony of Officers Douglas, Santos, and Laeng all confirm that Detective Kelly returned to the station after the traffic stop, prepared the "Form VII warrant on complaint," and obtained Ms. Bellini's authorization and signature before Plaintiff was arrested.  (Doc. No. 36 at PageID# 311.)  Defendants insist that Plaintiff's interpretation of the body cam footage is incorrect, arguing that "what is clear to anyone who actually watches and listens to the video is that that Sgt. Laeng's words were intended to indicate not that the document had not been signed at that time, but simply that if Mr. Bryant wanted a copy of what they had typed up and had been signed they would provide one to him." (*Id*. at PageID# 312) (emphasis added).

For the following reasons, the Court finds that there is no genuine issue of material fact that the arrest warrant was signed by Berea Court Administrator Bellini prior to Plaintiff's arrest on October 19, 2022.  The documentary evidence in this case indicates that, after the traffic stop ended at approximately 1:25 p.m., Detective Kelly returned to the police station, completed a "Form VII warrant on complaint" and "Affidavit for Determining Probable Cause," and presented it to Ms. Bellini.  (Doc. No. 28 at PageID#s 219, 220, 225, 229.)  Ms. Bellini then "found that probable cause existed and she authorized the warrant." (Doc. No. 28 at PageID# 229.)[24]  The Complaint and Affidavit for Determining Probable Cause are both signed by Detective Kelly and Ms. Bellini and dated October 19, 2022.  (Doc. No. 28 at PageID#s 219, 220.)  Likewise, the Form VII Warrant on

---

[24] *See also* Douglas Incident/Offense Report dated October 19, 2022 (Doc. No. 28 at PageID# 225) ("After speaking with Cynthia [during the traffic stop], Det. Kelly returned to the Berea Police Department and a Form VII warrant for Domestic Violence was issued for James' arrest. *** Members of the Berea Police Department returned to [the Bryant residence] and were able to take James into custody without incident.")

37

Complaint is likewise signed by Ms. Bellini on October 19, 2022, with the words "Officer Designated by Judge" circled beneath her signature.  (Doc. No. 31-2 at PageID# 281.)

The body cam footage reflects that, approximately one hour after the traffic stop ended (at around 2:25 p.m.), Sergeant Laeng, Officer Quinn, Officer Douglas and at least one other unidentified officer returned to the Bryants' residence and arrested Plaintiff on the charge of domestic violence in violation of Ohio Rev. Code § 2919.25(A).  *See* Quinn Video II; Laeng Video III.  As the officers are leading Plaintiff out of his foyer to exit the residence, the following exchange occurs:

> Plaintiff:    I'm trying to still figure out what I did.
>
> Officer:    The charge is domestic violence.
>
> Plaintiff:    Domestic violence? What did I do?
>
> Officer:    The allegations are that you struck your wife in the back of the head earlier today during the argument.
>
> [Sergeant Laeng enters the foyer with several pieces of paper stapled together in his hands.]
>
> Sgt. Laeng:    We have copies of the warrant that we typed up for the judge to sign [Laeng pauses and shows Plaintiff one of the pieces of paper] When we get back to the station, if you want to read it.
>
> Officer:    We will go over all of it with you.  At this point, you have a right to remain silent. You don't have to say anything to us at all. Okay?

*See* Arrest Body Cam Footage filed by Plaintiff at 14:34:42 to 14:34:58.  It is not entirely clear from the video footage what is written on the piece of paper that Sergeant Laeng shows to Plaintiff, but it appears to be a copy of Detective Kelly's Affidavit for Determining Probable Cause.

Even construing this video footage in a light most favorable to Plaintiff, the Court finds that it is not sufficient to create a genuine issue of material fact that the arrest warrant was not signed at

38

the time of Plaintiff's arrest.  Upon careful (and repeated) review, the Court agrees with the Officer Defendants that Sergeant Laeng's statement that "we have copies of the warrant that we typed up for the judge to sign [pause] when we get back to the station if you want to read it" does not indicate that the arrest warrant was, in fact, unsigned at that time.  Rather, the Court construes Sergeant Laeng's remark as simply explaining that the Officers had an arrest warrant and that, if Mr. Bryant wanted a copy, they would provide it to him once they got to the station.  Indeed, this is consistent both with the documentary evidence discussed above and with Sergeant Laeng's deposition testimony. Specifically, Sergeant Laeng testified as follows:

> Q: And what then happened when you made the traffic stop?
>
> A: I spoke to [Ms. Bryant], she told us that he did hit her, that she was afraid of him, she was afraid of having him arrested would make things worse for her, that kind of story, that it's a long history of it in their relationship.
>
> Q: So what, if anything, did you do as a result of that?
>
> A: Detective Kelly and myself, after speaking with her, advised her that based on what she told us, by law we are required to take action and **we filled out a, what we call, form seven warrant to have the judge or his designee sign to get an arrest warrant. And I believe the judge's designee Statia [sic] Bellini signed a form seven warrant** and Mr. Bryant's wife gave us the keys to access the home if he was refusing to answer the door, which after knocking on the door, he did not come to the door. **We made entry, found him in his bed, sleeping, and took him into custody at that time.**

(Laeng Depo. at Tr. 11-12) (emphasis added).  Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact that he was arrested without a warrant on October 19, 2022.

As noted above, "an arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest … made pursuant to § 1983." *Voyticky*, 412 F.3d at 677.  Nonetheless, the Sixth Circuit has held that "officers applying for a warrant must 'exercis[e]

39

reasonable professional judgment' so as to 'minimize' the 'danger of an unlawful arrest.'" *Fry*, 678 Fed. Appx. at 318 (quoting *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986)).  "As a result, a warrant application lacking sufficient indicia of probable cause such that it is unreasonable to believe that probable cause was established violates a person's right to be free from false arrest." *Id*. (citing *Messerschmidt v. Millender*, 565 U.S. 535 (2012) and *Malley,* 475 U.S. at 344–45).[25]

Here, Plaintiff was arrested for domestic violence under Ohio Rev. Code § 2919.25(A) (F4).  This offense is defined as follows: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."[26]  *Id*.  For the following reasons, the Court finds that there is no genuine issue of material fact that the Officer Defendants had probable cause to arrest Plaintiff under this statute based on the facts and circumstances known to them at the time of his arrest.  As set forth in Detective Kelly's Affidavit for Determining Probable Cause, the police received a 911 call indicating that Ms. Bryant had reported that Plaintiff had taken her phone, hit her in the head, and stated that "it would be a miracle" if she was alive by the end of the day.  The caller expressed concern for Ms. Bryant's safety and told the dispatcher that Plaintiff "has a real bad temper" and that there was a "history of violence."  Officers responded to the Bryants' residence and asked, repeatedly, to speak privately with Ms. Bryant to ensure that she was okay.  Detective Kelly notes in his Affidavit (and the video footage in this case confirms) that Plaintiff became agitated and refused to allow any

---

[25] In addition, "the deliberate or reckless submission of false statements or omission of facts that are material to a probable cause determination is unconstitutional." *Fry*, 678 Fed. Appx. at 318. *See also Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015); *Sykes v. Anderson,* 625 F.3d 294, 305 (6th Cir. 2010.  Here, however, Plaintiff has not argued (or directed this Court's attention to any evidence) that any of the Officer Defendants made any deliberate or reckless false statements or omitted facts that were material to the probable cause determination.  Thus, the Court deems this issue waived.

[26] Plaintiff was charged with a fourth degree felony charge of domestic violence due to his previous 2003 conviction for domestic violence.  *See* Ohio Rev. Code § 2919.25(D)(1)(3).

40

of the responding Officers to speak privately with Ms. Bryant.[27]  Detective Kelly then called the Bryants' landline and spoke with Ms. Bryant while she was on the speaker phone with Plaintiff. Shortly thereafter, during the traffic stop, Ms. Bryant told Sergeant Laeng and Detective Kelly that Plaintiff "did strike her in the back of her head during an argument earlier today."  (Doc. No. 28 at PageID# 220.)

Even viewing the above evidence in a light most favorable to Plaintiff, the Court finds, based on the totality of the circumstances, that the "facts and circumstances" known to the Officer Defendants at the moment of the arrest were "sufficient to warrant a prudent person ... in believing ... that" Plaintiff had knowingly caused physical harm to a family or household member, in violation of Ohio Rev. Code § 2919.25(A) (F4).  *See Sykes*, 625 F.3d at 306.

Plaintiff argues, however, that "the police officers lacked probable cause for the arrest owing to the coercion practiced upon his wife to intimidate her to giving them what they wanted in order to effect an arrest upon Plaintiff Bryant." (Doc. No. 34 at PageID# 297.)  The Court rejects this argument.  The video footage reflects that Sergeant Laeng initiated the traffic stop of Ms. Bryant at approximately 12:58 p.m.  (Laeng Video II at 12:58.)  He advised Ms. Bryant that he "just wanted to make sure everything's okay with you" and asked her "what's going on."  (*Id*. at 12:58:48 - :55.) Less than two minutes later (at approximately 12:59 p.m.), Ms. Bryant reported that Plaintiff had "hit me in my head."  (*Id*. at 12:59:42 - :48.)  Very shortly after that (at approximately 1:01 p.m.), Ms. Bryant again acknowledged that Plaintiff had "slapped" her in the head.  (*Id*. at 13:00:04 to 13:01:18.)

---

[27] Although Ms. Bryant appeared on a step inside the house and told Officer Santos that she was okay, it is clear from both the video footage and Officer Santos' deposition that Officer Santos believed that Ms. Bryant had answered in a "shaky voice" and appeared frightened.  When Sergeant Laeng and Officer Quinn responded and tried again to speak privately with Ms. Bryant, Plaintiff became even more agitated and slammed the front door in the Officers' faces.  Officer Quinn remarked that Plaintiff "certainly wasn't acting rational" and expressed concern for Ms. Bryant's safety.

At no point during the traffic stop did either Sergeant Laeng or Detective Kelly raise their voices or try to intimidate or coerce her into reporting that Plaintiff had engaged in domestic violence. Although it is clear that she does not want to press charges, Ms. Bryant repeatedly explains that it is because of her fear that doing so will "only makes things worse"— not because she does not believe that Plaintiff had, in fact, committed domestic violence. [28]  Thus, the Court rejects Plaintiff's argument that the Officers lacked probable cause because they "intimidated" or "coerced" Ms. Bryant during the traffic stop.

Accordingly, and for all the reasons set forth above, the Court finds that the Officer Defendants are entitled to qualified immunity with respect to this claim because the facts, even when taken in the light most favorable to Plaintiff, show that the Officer Defendants' conduct did not violate Plaintiff's Fourth Amendment rights when they arrested him on October 19, 2022.[29]  Having found that no constitutional violation occurred, the Court need not reach the second tier of the qualified immunity analysis, i.e., whether the constitutional right violated was clearly established. As the Supreme Court has explained, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  *See also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[28] The Court notes that, after Plaintiff was arrested, Ms. Bryant completed a handwritten statement dated October 19, 2022. (Doc. No. 27 at PageID#s 182-185.)  Therein, Ms. Bryant states, among other things, as follows: "I have received a lot of calls telling me I did the right thing by getting away from him, it's been going on way too long.  He [indecipherable] is a man has the right to verbally, mentally and physically abuse a woman, he's the head of the house, and he is always right.  Thank you for helping me on Wed Oct 19th.  There was many to many time this has happened but I was too afraid to call and do anything, but I am not turning backward!" (*Id.* at PageID# 185) (spelling, grammar, and punctuation as in original).

[29] Because the Court finds that Plaintiff was arrested pursuant to a facially valid warrant that is supported by probable cause, the Court need not (and will not) address the Officer Defendants' argument that, even if the warrant was invalid, "it does not matter" because Ms. Bryant provided the house key to Detective Kelly during the traffic stop and "this is straightforward consent to enter by a co-tenant of the residence."  (Doc. No. 36 at PageID# 322.)

### ii.    Malicious Prosecution

Plaintiff also asserts an individual capacity claim against the Officer Defendants under § 1983 for malicious prosecution.  Under federal law, a plaintiff must prove four elements to establish a malicious prosecution claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was resolved in the plaintiff's favor.  *Sykes*, 625 F.3d at 308-09.  *See also Lester v. Roberts*, 986 F.3d 599, 606 (6th Cir. 2021). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017). However, "the § 1983 version of 'malicious prosecution' is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'" *Id*. (citation omitted).

Here, the Officer Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's malicious prosecution claim for the same reason that they are entitled to qualified immunity with respect to Plaintiff's false arrest claim — i.e., because there is no genuine issue of material fact that the Officers had probable cause to arrest and prosecute Plaintiff for domestic violence.  (Doc. No. 31 at PageID# 271-274.)  The Officer Defendants further assert that Plaintiff's claim fails because his "criminal case did not resolve in his favor."  (*Id*. at PageID# 274.)  Defendants note that Plaintiff's domestic violence charge was dismissed without prejudice after Ms. Bryant passed away and argue that "charges against Plaintiff could be re-filed up until the expiration of the statute of limitations for felony domestic violence in Ohio, which is six years."  (*Id*.)  As the

43

limitations period has not expired, "it still remains a possibility that the case could be developed by Defendants as new evidence or witnesses may be found." (*Id.*)

In response, Plaintiff acknowledges that his "claims for wrongful arrest and wrongful prosecution both rise and fall with the analysis of whether [the Officers] had probable cause to arrest him …" (Doc. No. 34 at PageID# 295.)  Plaintiff repeats his arguments that he was arrested without a warrant and that the Officer Defendants lacked probable cause for his arrest in light of their coercion of Ms. Bryant during the traffic stop.  (*Id.* at PageID# 297.)  Plaintiff's only specific argument regarding his malicious prosecution claim is the following sentence: "In addition, the defendants are liable for malicious prosecution of Plaintiff Bryant as a further constitutional violation."  (*Id.*)  Plaintiff does not acknowledge or address Defendants' argument that his malicious prosecution claim fails because Plaintiff's criminal case did not resolve in his favor since Plaintiff's domestic violence charge was dismissed without prejudice after Ms. Bryant passed away and the charges against Plaintiff could be re-filed up until the expiration of the statute of limitations for felony domestic violence in Ohio.

For the following reasons, the Court finds that the Officer Defendants are entitled to qualified immunity with respect to Plaintiff's 1983 malicious prosecution claim.  "In order to prove malicious prosecution under federal law, a plaintiff must show, at a minimum, that there is no probable cause to justify an arrest or prosecution." *Voyticky,* 412 F.3d at 675.  *See also Dibrell v. The City of Knoxville, Tennessee,* 984 F.3d 1156, 1164 (6th Cir. 2021) ("To prove that a prosecution (or the detention accompanying it) was an 'unreasonable' 'seizure,' a plaintiff must show, among other things, that the state lacked probable cause for the prosecution (or detention)."); *Tlapanco,* 969 F.3d at 654.  Here, as detailed *supra*, the Court has found there was no constitutional violation because the

44

Officer Defendants acted pursuant to a facially valid arrest warrant that was supported by probable cause.[30] Accordingly, the Officer Defendants are entitled to summary judgment on the basis of qualified immunity with respect to Plaintiff's malicious prosecution claim.

### 3. State Law Claims

Lastly, the Court addresses Plaintiff's state law claims for intentional infliction of emotional distress against the Officer Defendants (Count Three) and malicious prosecution against Defendant City of Berea (Count Four). (Doc. No. 1 at ¶¶ 14-19.) Defendants argue that they are entitled to summary judgment in their favor with respect to these claims on the basis of political subdivision immunity under Ohio Rev. Code § 2744.01 *et seq*. (Doc. No. 31 at PageID#s 174-276.) Defendants argue that all of Plaintiff's claims stem from the Officer Defendants' investigation and ultimate arrest of Plaintiff. (*Id.*) Defendants assert that such police operations are "undoubtedly a governmental function" for which Defendant City of Berea is entitled to immunity under Ohio Rev. Code § 2744.02(A)(1). (*Id.*) Defendants further assert that Plaintiff's state law claims are intentional tort claims for which there is no exception to immunity as a matter of law. (*Id.*) Lastly, Defendants argue that the Officer Defendants are entitled to political subdivision employee immunity under Ohio Rev. Code § 2744.03(A)(6) because their actions "were within the scope of employment and there is no

---

[30] Although not raised by either party, the Court further notes that "[a] grand jury's indictment also creates a presumption that probable cause existed, one that the plaintiff can overcome only by showing that the defendant fabricated evidence or recklessly made false statements outside the grand jury." *Dibrell*, 984 F.3d at 1164. *See also Price v. Montgomery County, Kentucky,*72 F.4th 711, 725 (6th Cir. 2023); *King v. Harwood,* 852 F.3d 568, 587 (6th Cir. 2017); *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006); *Anderson v. Knox County,* 2023 WL 4536078 at * 5 (6th Cir. July 13, 2023). Here, the state court docket reflects that, in November 2022, a Cuyahoga County Grand Jury returned an indictment against Plaintiff for one count of domestic violence in violation of Ohio Rev. Code § 2919.25(A) (F4) as a result of the October 19, 2022 incident involving Ms. Bryant. Moreover, Plaintiff does not argue (or direct this Court's attention to any evidence) that any of the Officer Defendants fabricated evidence or recklessly made false statements outside the grand jury. Thus, Plaintiff's § 1983 malicious prosecution claim fails for this reason as well.

evidence that the actions were in bad faith, with malicious purpose, or were done in wanton, or reckless manner."  (*Id*. at PageID# 276.)

Plaintiff fails to acknowledge or address any of the above arguments at any point in his Brief in Opposition.  (Doc. No. 34.)

Considering Plaintiff's lack of opposition, the Court finds that Plaintiff has abandoned his state law claims against Defendants as set forth in Counts Three and Four of the Complaint.  *See Nathan*, 992 F.3d at 564 n.1; *Brown,* 545 Fed. Appx at 372; *Lisan*, 835 Fed. Appx at 834–35; *Nowlin*, 2018 WL 1805141 at *3; *Haddad*, 610 Fed. Appx at 568; *Hicks,* 449 Fed. Appx at 487.  Accordingly, Defendants' Motion for Summary Judgment with respect to Counts Three and Four is granted.

## V.      Conclusion

Accordingly, for all the reasons set forth above, Plaintiff's Motion for Leave to File Sur-Reply Instanter (Doc. No. 37) is GRANTED IN PART and DENIED IN PART, as set forth herein. Defendants' Motion for Summary Judgment (Doc. No. 31) is GRANTED.

**IT IS SO ORDERED.**


　　　　　　　　　　　　　　　*s/Pamela A. Barker*
　　　　　　　　　　　　　　　PAMELA A. BARKER
Date:  June 24, 2025　　　　　　U. S. DISTRICT JUDGE